**David MADSEN, Plaintiff and Appellee,**

v.

**UNITED TELEVISION, INC., a Delaware corporation, and John Harrington, Defendants and Appellants,**

v.

**SALT LAKE CITY CORPORATION, Subpoenaed Party and Cross–Appellant.**

**David MADSEN, Plaintiff and Appellee,**

v.

**UNITED TELEVISION, INC., a Delaware corporation, and John Harrington, Defendants and Appellees,**

v.

**SALT LAKE CITY CORPORATION, Subpoenaed Party and Appellant.**

Nos. 880412, 880416.

Supreme Court of Utah.

Nov. 9, 1990.

Thomas R. Karrenberg, Robert M. Anderson, Jesse C. Trentadue, Salt Lake City, for United Television, Inc.

John Harrington, Jerome H. Mooney, Salt Lake City, for David Madsen, Roger F. Cutler, Greg R. Hawkins, Salt Lake City, for Salt Lake City Corp.

HOWE, Associate Chief Justice:

This is an interlocutory appeal from an order granting in part and denying in part a motion by Salt Lake City for a protective order preventing discovery of its police department personnel and internal affairs files. The issue is whether these files, compiled on a police officer involved in a fatal shooting, are discoverable by a media defendant in a defamation action brought by the police officer.

## FACTS

On October 26, 1987, police were called to the home of Clemente Garcia in Salt Lake City in connection with a domestic dispute. Garcia fled in his truck, pursued by city police. Plaintiff David Madsen, one of the police officers, blocked the road with his car. Garcia stopped his truck and stepped out, carrying a weapon. He turned toward Madsen, who opened fire, killing Garcia.

United Television, Inc., presented the story on its television news over a period of weeks. Madsen charges that United Television reported false information about his conduct and employment record: that Madsen placed himself openly on the road, ignoring the need for protective cover; that he opened fire with disregard for the safety of other officers who were in the line of fire; that he violated police procedures; and that he had a poor record with the police department.

Madsen commenced this defamation action against United Television and its reporter, John Harrington, claiming that these statements were untrue, damaged his reputation, and impaired his ability to perform as a police officer. United Television issued a subpoena duces tecum to the City requiring it to produce several categories of documents relating to the events surrounding Garcia's death and Madsen's performance record as a police officer. The City produced the subpoenaed records with the exceptions of personnel and internal affairs files, for which it sought a protective order.

The parties stipulated to the submission of the disputed materials to the trial court for an *in camera* review. The court declined to make the review and ordered oral argument on the City's motion for a protective order. Following oral argument, the court denied the motion as to the personnel file and partially granted the motion as to the internal affairs files. The City was ordered to disclose all initial complaints made against Madsen and their disposition from the internal affairs files, but with the names of all complainants and investigating officers deleted.

Both parties petitioned for interlocutory appeal, which we granted. United Television contends that it is being denied its right to "obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party...." Utah R.Civ.P. 26(b)(1) (emphasis added). The names of the complainants and investigating officers, which were deleted by the court, are sought by United Television to provide witnesses to "the truth ... [and to] what, if any, damage has been done to Madsen's reputation." *See Brady v. Ottaway Newspapers, Inc.*, 110 A.D.2d 614, 487 N.Y.S.2d 367 (App.Div. 1985) (in libel action, newspaper is entitled to an *in camera* inspection of police officers' personnel records when files may con-

tain relevant information on damage to future careers).

The City responds that its records are privileged and argues the applicability of three privileges with which we shall deal in turn.

### OFFICIAL CONFIDENCE AND COMMON LAW EXECUTIVE PRIVILEGE

■ The City first asserts a statutory "official confidence" privilege. Utah Code Ann. § 78–24–8 (Supp.1989) provides:

There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate. Therefore, a person cannot be examined as a witness in the following cases:

. . . .

(5) A public officer cannot be examined as to communications made to him in official confidence when the public interests would suffer by the disclosure.

Under subdivision (5), evidence may be excluded "upon the grounds of public policy, because of the confidential nature of such communication, when the disclosure would prejudice, in the language of the statute, 'public interests.' " *State v. Hoben*, 36 Utah 186, 197, 102 P. 1000, 1005 (1909) (interpreting predecessor statute, Comp. Laws 1907 § 3414 subd. 5). The Supreme Court of Washington made the following observation about an almost identical statute of that state: "By its terms, RCW 5.60.060(5) grants only a *conditional* privilege. Confidential communications to a police officer are privileged *only* when the public interest would suffer by their disclosure." *Barfield v. City of Seattle*, 100 Wash.2d 878, 883, 676 P.2d 438, 441 (1984) (emphasis in original).

■ The City also relies on common law executive privilege which, like the official confidence privilege, is conditioned on harm to the public interest. As the Utah Court of Appeals stated in *Meyers v. Salt Lake City Corp:*

[U]nder executive privilege, government [department] heads may prevent disclosure of documents within their control if nondisclosure would serve the public interest. . . . [T]he privilege is not absolute and the government's interest in maintaining confidentiality must be weighed against the interest of those seeking discovery of the material.

747 P.2d 1058, 1060 (Utah Ct.App.1987) (citing to *Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432, 437–38 (10th Cir.1981)).

■ When the statutory confidential information privilege or the common law executive privilege is asserted in opposition to a request for civil discovery under Utah Rule of Civil Procedure 26(b)(1) and Utah Rule of Civil Procedure 34,

the trial court must make an independent determination of the extent to which the privilege applies to the materials sought to be discovered. This determination is the result of the *ad hoc* balancing of: (a) the discoverant's interests in disclosure of the materials; and (b) the government's interests in their confidentiality.

*Martinelli v. District Court of Denver*, 199 Colo. 163, 612 P.2d 1083, 1088 (1980) (citations omitted).

■ In *Martinelli*, the Colorado Supreme Court gave these guidelines on executive privilege [1] to which we subscribe and find equally applicable to the statutory privilege claimed by the City:

The trial court must balance the competing interests through an *in camera* examination of the materials for which the official information privilege is claimed. Such a review enables the trial court: (a) to allow or disallow discovery as to individual items of material for which the privilege is claimed; or (b) to excise or edit from individual items those matters which it determines to come within the

---

1. We, like the *Martinelli* court, specifically exclude from the scope of our discussion two forms of the privilege: (a) that which relates to diplomatic or military secrets (*see generally United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)); and (b) that which relates to the identities of informants who supply the government with information about the commission of crime. *Martinelli*, 612 P.2d at 1088 n. 1.

scope of the privilege; or (c) to take other protective measures pursuant to [Utah Rule of Civil Procedure] 26(c).... The factors to be considered by the trial court in this *in camera* balancing process vary widely, depending on the nature of the litigation and of the materials sought to be discovered. Because the balancing process proceeds on an *ad hoc* basis, the effect of the doctrine of *stare decisis* in cases requiring application of the official information privilege is limited.

*Martinelli,* 612 P.2d at 1088–89 (footnote omitted) (citing *Frankenhauser v. Rizzo,* 59 F.R.D. 339, 344 (E.D.Pa.1973)); *cf. KUTV, Inc. v. Utah State Bd. of Educ.,* 689 P.2d 1357, 1362 (Utah 1984) (approving *in camera* inspection of records falling under the Public and Private Writings Act).

■ The parties in the instant case represent that the district court refused to inspect the materials *in camera* because of their large volume. The party claiming the executive or statutory confidential information privilege

> must aid the trial court by providing a "specific designation and description" of each item of material for which the privilege is claimed, "as well as precise and certain reasons" for preserving the confidentiality of each item. *Black v. Sheraton Corporation,* 371 F.Supp. 97, 101 (D.D.C.1974). The trial court may properly reject a broad, nonparticularized claim of the privilege, made with respect to an entire group of materials. *Id.;* [Comment, *Discovery of Government Documents and the Official Information Privilege,*] 76 Colum.L.Rev. 142, 168 [1976].

*Martinelli,* 612 P.2d at 1089 n. 3.

As we stated above, the factors to be considered in the *in camera* balancing process vary widely. The Supreme Court of Colorado adopted a ten-point formulation of factors from the *Frankenhauser* decision as illustrative of the range of factors to be considered by trial courts. *Id.* at 1089. We express no opinion on the use of this formulation of factors and leave to the discretion of trial courts, except as discussed below, the decision as to what factors to use and their relative weight. Parties seeking to preserve confidentiality are free to articulate any precise and certain reasons for so doing.

■ Several of the reasons given by the City for maintaining the confidentiality of the internal affairs files involve broad public policy contentions. These may be properly disposed of here. The City contends that the public interest would be harmed by discovery of internal affairs files because (1) discovery would impair and cause a "chilling effect" on the ability of a police administrator to obtain full and candid reporting from officers, (2) police administrators would be encouraged not to fulfill their duty to fully investigate internal complaints if the results are discoverable in a civil action involving the officer, and (3) the free flow of information from complainants would be jeopardized.

Other courts have rejected these reasons in civil actions. On the subject of "full and candid reporting," one federal district court has noted:

> An officer's incentives to hide a friend's misconduct, or to be scrupulously forthcoming lest he be disciplined for having concealed information, are probably much more closely tied to the internal investigative machinery than to the fear of ... litigation....
>
> ... In sum, disclosure to ... litigants is probably a minute influence on officers' candor.

*King v. Conde,* 121 F.R.D. 180, 192–93 (E.D.N.Y.1988); *see also Kelly v. City of San Jose,* 114 F.R.D. 653, 665 (N.D.Cal. 1987) ("[T]he possibility of disclosure to a civil litigant probably adds almost nothing to the pressure to dissemble that officers already would feel.").

Other courts have also expressed the view that

> knowledge that a limited number of persons, as well as a state or federal court, may examine the file in the event of civil litigation may serve to insure that these investigations are carried out in an evenhanded fashion, that the statements are carefully and accurately taken, and that

the true facts come to light, whether they reflect favorably on the individual police officers involved or on the department as a whole.

*Mercy v. County of Suffolk*, 93 F.R.D. 520, 522 (E.D.N.Y.1982); *see also Kelly*, 114 F.R.D. at 665 ("Fear of scrutiny by knowledgeable people motivated to be aggressive is likely to inspire police officers to conduct investigations and write reports that are less vulnerable to criticism, and the way to make them less vulnerable is to make them more thorough, more accurate and better reasoned.").

The argument that discovery would chill citizen complaints has been similarly unpersuasive:

> This ... is an empirical question, but the more persuasive hypothesis is that disclosure will have no influence on citizen complainants. "It is not at all clear that people who feel aggrieved by actions of police officers would even think about the possibility that their complaints might be disclosed to another person who feels aggrieved by police officers." *Kelly*, ... 114 F.R.D. at 666. Presumably those who did think about disclosure would ordinarily approve of it, because they would hope to assist others similarly aggrieved. *See id.* In the usual case, this factor should be accorded little weight. *See also Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973).

*King v. Conde*, 121 F.R.D. at 193–94.

We agree with the statements made by these courts and with the conclusion of the Washington Supreme Court that "[d]isclosure of [internal affairs files] has a very slight potentiality of harming the public, especially in a legal proceeding where judicial controls can be imposed." *Barfield*, 676 P.2d at 441.

We hold that the district court must conduct an *in camera* review of the personnel and internal affairs files, but we reject the City's specific reasons articulated above for maintaining the confidentiality of the complainants and investigating officers named in Officer Madsen's internal affairs files.

## PRIVATE PAPERS PRIVILEGE

The City next contends that Officer Madsen has a right of privacy in the files kept by the police department on him. Reliance for that right is chiefly on the Archives and Records Services and Information Practices Act, Utah Code Ann. §§ 63–2–59 to –89.

There the legislature recognized a "right of privacy in relation to personal data gathered by state agencies." § 63–2–60(2) (1989). Specifically, the City seeks *in camera* inspection to guarantee that only relevant information is disclosed and to protect Madsen's privacy interests. As we have already granted this relief under executive privilege, we need not deal separately with this issue.

## ATTORNEY–CLIENT PRIVILEGE AND WORK PRODUCT

■ The City's final contention is that attorney-client privilege and work-product doctrine apply to the internal affairs files. As in the case of *Frankenhauser v. Rizzo:*

> The facts here do not suppo_t the privilege claim. The investigative reports are not a part of a consultation process between lawyer and client, or among representatives of the client designed to facilitate the rendition of legal services to the client. Nor were they requested by a lawyer to evaluate a client's legal situation....

59 F.R.D. at 342 n. 4 (citations omitted).

The work-product claim is also inapplicable. The investigations reported in Madsen's internal affairs files were "undertaken not in anticipation of litigation but rather as a routine procedure." *Id.* at 342 n. 5. "The work product doctrine does not apply to information collected or communications made in the normal course of business. It applies only to material generated primarily for use in litigation, material that would not have been generated but for the pendency or imminence of litigation." *Kelly*, 114 F.R.D. at 659. *See generally Gold Standard, Inc. v. American Barrick Resources Corp.*, 144 Utah Adv.Rep. 3, —— P.2d —— (Utah Sept. 21, 1990); *Gold*

*Standard, Inc. v. American Barrick Resources Corp.*, 801 P.2d 909 (Utah 1990).

We remand to the district court for *in camera* review of the personnel and internal affairs files.

HALL, C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., concurs in the result.